## HENRY ATKINSON v. THE STATE.

### *No. 704.    Decided May 4.*

1.  Indictment—"Attempt" and "Intent."—Inasmuch as the word "attempt" embraces the full meaning of "intent," and more, it is admissible to substitute it in an indictment for the word "intent."

2.  Robbery—Indictment—Use of the Word "Attempt" for "Intent."—Robbery is defined in our Penal Code as "a fraudulent taking from the person or possession of another, any property with intent to appropriate the same to the use of the taker, by means of an assault," etc. (article 722.)    *Held,* that where an indictment charged the assault, and that by putting in fear, etc., defendant "did attempt to fraudulently take," etc., the allegation of "attempt," in the connection in which it is used, embraces the technical word "intent" as used in the statute, and that the indictment is good.

3.  Evidence—Separate and Distinct Conversations as to Same Subject.—The introduction by the State of evidence of a conversation between defendant and one party will not render admissible a subsequent conversation upon the same subject between defendant and another party, which is an entirely new and distinct conversation, having no connection with the previous conversation.

4.  Conspiracy to Rob—Evidence of Acts and Declarations of Coconspirators.—On a trial for robbery, where a conspiracy to commit the crime is shown by other evidence, the acts and declarations of a coconspirator are admissible against the one on trial.

5.  Circumstantial Evidence—Charge.—Where the case is not wholly dependent upon circumstantial evidence, it is not error for the court to fail to charge upon circumstantial evidence.

APPEAL from the District Court of Houston.    Tried below before Hon. J. R. BURNETT.

This appeal is from a conviction for robbery, the punishment being assessed at a term of two years in the penitentiary.

The charging part of the indictment is set out in the opinion.    A motion in arrest of judgment called in question the sufficiency of the indictment, in that it did "not charge an assault with intent to rob, but charges an assault and attempt to rob; and there is no such offense known to the law," etc.    This motion was overruled.

It was proved by Bob Tullas, who was a brother-in-law of defendant, that a week or so before the attempted robbery he heard a con-

versation between Asa Perry, Henry Atkinson, the defendant, and Marcus Ross, in which they were planning and talking about going up on the prairie to make a raid. S. D. Knox lived on the prairie, and owns the only store there. On the evening of the attempted robbery he heard a conversation between Asa Perry and Marcus Ross, in which Perry said, "We are going up on the prairie to-night and make a raid." That Henry Atkinson, the defendant, borrowed his horse that evening, saying that he was going to his uncle's, Dave Ross, to stay all night. That on that same night, about 3 a. m., he and others went to where defendant was, by a log fire, in a field, and found him shot; and he said he was shot at Knox's.

S. D. Knox testified: "On the night of the 16th of January, 1895, a man called at my house at about 8:30 o'clock. His calling waked me, and I put on my coat and pants and put my pistol in my pocket, taking it from under my pillow, and slipped on my shoes without socks. I asked the man what he wanted. He said he wanted some lemon ginger, and something to eat. I asked him to come in, and he said he hadn't time. I went out to the gate and started down to the store—I and the man. I asked him his name, and he said, Jimmie Trimmer. I owned a store about 150 yards from my house. My house and store are in Houston County, Texas, on high prairie. When we got to the store, the man hitched his horse, and I opened the door and struck a match. I went in first, and as the man walked up to the door I said, 'Come in,' and he came in, passed a little by me, and about six or eight feet to my left. Just as I was in the act of lighting the lamp, or had just lit it, still holding the chimney in my hand, the man said, 'Hold up your hands!' I threw my eyes on him and said, 'What did you say?' and saw that he had his pistol presented on me. He answered, 'O, hold up your hands,' and I reached for my pistol, and as I drew it he fired. His ball cut my coat on the shoulder and went into the right-hand casing of the door, and the powder burned my face. I shot just as quick as I could. The explosion of his pistol put out the light, but I shot as near as I could at the place where he stood. I then heard a shuffle on the floor and shot at that. I then stepped or jumped out of the door, and saw what I took to be the bulk of a man, and fired at it. This man then ran off, and I ran to my father's. As I went I fell into a ditch and broke the lamp chimney, and just then I heard what I thought was a horse galloping off, and thinking some one was on the horse, I attempted to shoot, but my pistol snapped. When I got to my father's he met me at the gate, and after examining to see if I was hurt, father and I went back to the store; and when we got in the store, father picked up a pistol from the floor and said, 'Here is his pistol.' As we went down to the store, we heard some groaning off to the left, and when we came out of the store we heard groaning at the same place. We went out there and found the body of a man, who breathed once or twice after we got there. This body was identified at the jury of inquest as the body of Asa Perry. I thought it

was the same man who had come into the store. I could not describe the man at all, for I did not know him, and had never seen him before. The body had one bullet hole in it. We examined for bullet marks; only found one sign in the house, which was the one already mentioned; in the door facing. Found one in the fence, about one inch from the top of the bottom plank, a six inch plank. I shot only once outside the house. When the inquest examined the body there was a false mustache on it; that is, it had partly dropped off, but was still hanging to his lips. It was made of black horse hair."

George Waller testified: "Am sheriff of Houston County. Went down to try to arrest defendant, but could not, because I could not find him. Hunted for him, but failed to find him. His father eventually brought him to me. We were at his father's house, and he told me we would go and get defendant. We went down into the wood, and I and my deputy stopped, at request of John Atkinson, and he (John Atkinson) went on and shortly after returned to us with the defendant. I brought the defendant on to Crockett. On the road he told me that he was persuaded into it; that Asa Perry persuaded him into it; that Perry said he would get Knox out and down to the store, by asking to buy some lemon ginger. I warned the defendant, before he made these statements, that he need not make a statement unless he wished, and that any statement he made might be used against him in the trial of the case. Before John Atkinson went down in the woods, and brought his boy to me, I told him that he had just as well give his boy up; that I was right after him, and that he was crippled, and we would catch him; that defendant had been shot; that he could make a good bond for his boy. After this conversation we went down in the woods, and it was then that he brought his boy up. I arrested the defendant on Saturday, after the attempted robbery."

Defendant testified: "I am the defendant in this case. Am 18 years old. Never was in court in my life before this case. Never had any trouble of any kind before this. I borrowed Bob Tullas' horse on the evening of the 16th of January, and started to go to my uncle, Dave Ross'. On the road I met Asa Perry and Marcus Ross. They persuaded me to go with them to a dance at Bob Goodman's and we started to go. On the road, Asa Perry asked me to let him ride the horse I was riding, saying that he had never ridden him, and wanted to see what sort of a horse he was. I agreed, and we exchanged. While we were going, Perry proposed that we should go by Knox's store and get some lemon ginger. I said no; that I did not want any, and didn't have any money to get it if I did. He said he had the money, and after talking awhile I agreed to go. We went on down there, and when we got near the store Perry told us to wait, as the store was closed, and he would go and get Knox to come down. We stopped, and he went in the direction of Knox's house. We stopped in the road about thirty steps from the store. After waiting, we saw no light in the house and heard nothing, and I was just about to

go to the store and see if they had come, when the pistols commenced firing. I ran up to the store to see what was up, when some one fired two shots at me, one of which went into my leg, and was taken out by Dr. Vann. I thought it was time for me to leave, and I ran back, jumped on the horse that I rode there (Perry's horse) and Marcus Ross and I ran off. It was a cold night. I went to Uncle Dave Ross' new ground by a log fire, and sent Marcus for Uncle Dave, and when he came I sent for my father. The reason I didn't go straight home was, that my sister was there expecting child-birth. I was afraid any sudden shock would injure her. When my father came, I told him how and where I was shot. Told Dr. Vann all about it when he took the bullet out of my leg. I did tell Mr. Waller, the sheriff, that I was persuaded into it by Asa Perry, and I simply meant that Perry persuaded me to go to the store under the impression that he was only going to buy lemon ginger. I did not tell Mr. Waller that I was persuaded into any attempt to rob. If Asa Perry had on any false mustache, he put it on after he left me. I did not stay out in the woods because I did not know what to do nor what I would be charged with, as Asa Perry had been killed, and how and why he was killed I did not know."

Defendant's bill of exceptions to the exclusion of Dr. Vann's testimony as to what defendant said to the doctor, recites, that his statements to the doctor were the same, substantially, as the statements testified to by Sheriff George Waller; but that, in his conversation with Dr. Vann, he explained what he meant by his statement to the sheriff, and he offered this explanation to remove any guilty intent on his part which might arise from his statements to said sheriff.

*G. C. Clegg* and *Adams & Adams*, for appellant.—The indictment is insufficient, and does not charge an assault with intent to rob, nor does it charge robbery; and it is insufficient to charge an attempt to rob, because, if an attempt be alleged, the cause of its prevention must also be alleged. The State v. Smith (Mo.), 24 S. W. Rep., 1000.

In intent to rob, the intent must be specifically alleged. Pefferling v. The State, 40 Texas, 486; Thomas v. The State, 16 Texas Crim. App., 535; McGee v. The State, 21 Texas Crim. App., 670; Burney v. The State, 21 Texas Crim. App., 565; Taylor v. The State, 22 Texas Crim. App., 529; Milton v. The State, 23 Texas Crim. App., 204. And see specially in point, Morris v. The State, 13 Texas Crim. App., 65. See also Hammons v. The State, 29 Texas Crim. App., 445; 1 Am. and Eng. Encyc. of Law, 936.

Upon the proposition that the court erred in excluding the testimony of Dr. Vann as to the explanatory statements made by the defendant to him, see Code Crim. Proc., art. 751; Epson v. The State, 16 S. W. Rep., 780.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—The appellant in this case was tried in the court below on a charge of assault with intent to commit robbery, and his punishment assessed at confinement in the penitentiary for a term of two years. Appellant assigns as error the refusal of the court to quash the indictment in this case, and also the refusal of the court to arrest the judgment, which involves the validity of the indictment to charge the offense. The indictment charges that the appellant "did make an assault," etc., "upon one S. D. Knox, and, by putting him in fear of life and bodily injury, did attempt to fraudulently take from the person and possession of the said S. D. Knox certain personal property," etc. The appellant insists, that the indictment should have charged that the assault was made with the intent to rob, and that the use of the word "attempt" does not convey the same meaning, and vitiates the indictment. Webster defines an "attempt" as follows: "To make trial or experiment of; to try; to endeavor." In 1 American and English Encyclopedia of Law, p. 936, it is defined as "an effort or endeavor; an act tending towards the accomplishment of a purpose which exceeds a mere intent or design, but falls short of an execution of it." Mr. Bishop (1 Criminal Procedure, section 80) says: "It seems impossible to doubt that the only distinction between an 'intent' and an 'attempt' to do a thing is that the former implies the purpose only, while the latter implies both the purpose and an actual effort to carry that purpose into execution. Since, therefore, the word 'attempt' embraces the full meaning of 'intent,' with something more, it is not impossible that the courts may hereafter hold it to be an admissible substitute in an indictment." Our Penal Code, article 722, defines "robbery" as "a fraudulently taking from the person or possession of another any property with intent to appropriate the same to the use of the taker by means of an assault," etc. The indictment in this case properly charges an assault, and then charges an attempt to fraudulently take personal property from the person or possession of the assaulted party, with intent to appropriate same to the use of defendant. It is difficult to see how an assault could be made on a person, and at the same time an endeavor or effort made to fraudulently take from such person property in his possession, without such party entertaining at the time the intent to do what he was then endeavoring to accomplish; and, in our opinion, the allegation of attempt in this case, in the connection in which it is used, embraces the technical word "intent" as used in the statute, and we accordingly hold the indictment good. Curry v. The State, 4 Texas Crim. App., 575; Hart v. The State, 38 Texas, 383; Prince v. The State, 35 Ala., 367; Johnson v. The State, 14 Ga., 55.

The appellant also complains in this case, that the court erred in refusing to permit the witness Dr. Vann to testify as to a conversation between the appellant and himself with regard to the alleged assault, and he claims that this testimony was rendered admissible because the State had introduced the sheriff, who testified as to the statement made

to him by the defendant several days previous to the alleged conversation between said witness Vann and appellant. It is sufficient to say, that the testimony offered from the witness Vann was no part of the conversation which had been adduced by the State. Though on the same subject, it was an entirely new and distinct conversation between said witness and the defendant, having no connection with the previous conversation, and the court did not err in refusing to admit same.

With regard to the admission of the testimony of the witness Tullas, as to declarations made by Asa Perry, one of the parties engaged in the assault, made to him on the evening of the day when said assault is alleged to have been made, same was rendered admissible by other evidence in the case which tended to show a conspiracy between the said Asa Perry, Marcus Ross, and the appellant to rob the said S. D. Knox. The evidence leaves no question as to the defendant's being present at the time the alleged assault was made on Knox. He admits this himself, and states when he heard the shooting in front of the store he immediately ran around, and was shot in the knee, and then ran off. The witness Knox testifies positively to the assault. He killed Asa Perry, one of the assaulting party, and testifies that he shot at another as he ran out of the store. This was not a case depending wholly on circumstantial evidence, and the court committed no error in failing to charge on circumstantial evidence.

We find no error in the record requiring the reversal of this case, and it is accordingly affirmed.

*Affirmed.*

Judges all present and concurring.