## MIGUEL P. MARTINEZ v. THE STATE.

### No. 3337.  Decided November 18, 1914.

#### 1.—Murder—Circumstantial Evidence—Flag—Newspaper Manifesto.

Where, upon trial of murder, it was necessary for the State to show that the defendant was a member of an armed band who in their attempt of an armed invasion into the Republic of Mexico incidentally killed deceased and committed other outrages upon the sheriff and his posse before they could be arrested, there was no error in permitting the State, in order to prove the conspiracy, to introduce in evidence a certain flag carried by one of the party and a certain newspaper manifesto, and other articles of war which were found in their camp.

#### 2.—Same—Rule Stated—Circumstantial Evidence.

Circumstantial evidence is admissible to prove conspiracy from the very nature of the case, and where, upon trial of murder, defendant's connection with the conspiracy was not admitted, there was no error in permitting the State to introduce testimony of the different facts going to show a conspiracy to invade the Republic of Mexico by an armed force, of which defendant was a member and pending which the deceased was killed.

### 3.—Same—Rule Stated—Great Latitude Allowed.

In the reception of circumstantial evidence, great latitude must be allowed, and it is no objection that the evidence covers a great many transactions and extends over a long period of time.

### 4.—Same—Evidence—Conspiracy—Rule Stated.

If it be shown that several have combined together for the same illegal purpose, any act done by one of them in pursuance of the original plan and with reference to the common object is, in contemplation of law, the act of all, and is admissible in evidence. Following Atkinson v. State, 34 Texas Crim. Rep., 424, and other cases.

### 5.—Same—Evidence—Intent—Collateral Facts.

Where the guilt of a party depends upon the intent, purpose or design with which an act is done, or upon his guilty knowledge thereof, collateral facts in which he bore a principal part may be examined into for the purpose of establishing such guilty intent, design, purpose or knowledge.

### 6.—Same—Common Design—Conspiracy—Rule Stated.

Although the fraudulent and corrupt combination—the common design—is the essential element, it is not necessary to prove that the defendants came together and actually agreed in terms to have this common design and to pursue it by common means and so carry it into execution, if their acts and the means used, one performing one part of an act, and another another part of the same act, shows a conspiracy, the same is admissible in evidence. Following Mason v. State, 31 Texas Crim. Rep., 306, and other cases.

### 7.—Same—Conspiracy—Exploded Doctrine—Conspiracy.

The ancient doctrine that a conspiracy must first be established *ipso facto* before proof of acts and declarations of the individual conspirators are admissible against each other is now exploded. Following Smith v. State, 21 Texas Crim. App., 107, and other cases.

### 8.—Same—Case Stated—Conspiracy—Circumstantial Evidence.

Where, upon trial of murder, the evidence showed that the defendant and others had combined and armed themselves for an armed invasion into the Republic of Mexico during which, in an effort of the sheriff and his posse to arrest the defendant, they captured two of his posse and incidentally killed one of them after many acts of torture, etc., there was no error in permitting the State to introduce testimony as to the articles of war found in the camp of the defendants, together with a certain written manifesto as to their intention in carrying out their conspiracy, and all the circumstances and what each of the conspirators said and did from the time of their discovery by the sheriff's posse until their arrest.

### 9.—Same—Evidence—Confession.

Where defendant's co-defendant, when arrested, told the officers where the defendant and others could be found, and they were found as pointed out by said statement, there was no error in admitting same in evidence.

### 10.—Same—Evidence—Clothes of Deceased.

Where, upon trial of murder, the hat worn by the deceased and the rope with which he was tied, and other articles connected therewith, were introduced to aid in demonstrating the manner and mode of the homicide and the position deceased was in at the time, there was no error.

### 11.—Same—Evidence—Handcuffs—Co-defendants—Discretion.

Upon trial of murder, where defendant and others were shown to have conspired together for an armed invasion into the Republic of Mexico, pend-

ing which the deceased was killed by them, and defendant's identity and that of his companion was an issue in the case, there was no reversible error to have the co-defendants brought into court, although they were handcuffed at the time, it not appearing from the record that the defendant was brought into court handcuffed, or that the court acted beyond ordinary prudence and discretion.

### 12.—Same—Charge of Court—Principals.

Where, upon trial of murder, the court's charge on principals was applicable to the facts, and the verbal errors pointed out by defendant's objection were corrected, there was no error, and the contention that the court should have used the very language of article 78 of the Code, defining principals, is untenable.

### 13.—Same—Charge of Court—Objections.

Where the complaints of the charge of the court were not made during the time of trial, they came too late to be considered on appeal.

### 14.—Same—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence sufficiently sustained the conviction under a proper charge of the court, there was no reversible error. Davidson, Judge, dissenting.

### 15.—Same—Case Stated—Conspiracy—Charge of Court.

Where, upon trial of murder, the evidence showed that the killing grew out of the general conspiracy between defendant and others to enter the ·Republic of Mexico by an armed invasion, and that the killing was incident to and so connected with said general conspiracy in a way that if defendant was proven to be a party to the general conspiracy, it would be under such circumstances as to render him responsible for the death of the deceased equally with those who in fact fired the shots, an objection to the charge of the court not made at the time it was submitted that the court erred in authorizing a conviction if there was a specific conspiracy to take the life of the deceased, comes too later after trial.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a conviction of murder; penalty, twelve years imprisonment in the penitentiary.

The opinion states the case.

*Chambers & Watson,* for appellant.—On question of acts and declarations of third parties: Burks v. State, 50 Texas Crim. Rep., 47, 94 S. W. Rep., 1040; Powell y. State, 50 Texas Crim. Rep., 592, 99 S. W. Rep., 1005; Canon v. State, 59 Texas Crim. Rep., 398, 128 S. W. Rep., 141; Rainey v. State, 20 Texas Crim. App., 455.

On question of conspiracy: Figaroa v. State, 58 Texas Crim. Rep., 611, 127 S. W. Rep., 193; Moore v. State, 44 Texas Crim. Rep., 526; Webb v. State, 83 S. W. Rep., 394; Goodman v. State, 83 S. W. Rep., 196.

On question of declarations of co-conspirator in absence of defendant: Overstreet v. State, 67 Texas Crim. Rep., 565, 150 S. W. Rep., 630; Couch v. State, 58 Texas Crim. Rep., 505, 126 S. W. Rep., 866; Newton v. State, 62 Texas Crim. Rep., 622, 138 S. W. Rep., 708; Draper v. State, 22 Texas, 401; Ricks v. State, 19 Texas Crim. App., 308; Armstead v. State, 22 id., 51.

On question that conspiracy must be shown before acts and declarations of co-conspirators can be introduced: Figaroa v. State, 58 Texas Crim. Rep., 611, 127 S. W. Rep., 196; Holland v. State, 45 S. W. Rep., 727; Young v. State, 69 S. W. Rep., 153.

*C. E. Lane,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of murder, and his punishment assessed at twelve years confinement in the State penitentiary.

This is a companion case to those of J. A. Serrato, Lino Gonzales and Jesus Gonzales heretofore decided by this court, but not yet reported. In this case there is this difference between it and those heretofore decided—appellant did not testify, and, of course, his connection with the conspiracy is not admitted, nor is the object and purpose of the men banding themselves together.

To show that he was a member of the armed band found on Capones creek, the State proved that when Officers Ortiz and Buck were captured by Captain Rangel and his men, appellant was present and was one of the men who assisted in their capture, having a drawn gun in his hands; that he was present at the time when Sheriff Gardner and Marshal White were fired upon; that he was present when Buck and Ortiz were tied and loaded down as pack horses; that he was one of the guards who accompanied Buck and Ortiz to the place where Ortiz was killed; that he went with those who were guarding Buck some forty yards away when Ortiz was killed; that he continued with Rangel and his men until Buck was rescued, and continued with them until finally they were captured, being one of those engaged in the battle with the posse and soldiers at the time of the capture. While no one can say specifically they saw him fire a shot, yet he was in company with those, some dozen or more of whom were shooting at the posse and soldiers. This authorized a finding that he was a member of the company, in the absence of any testimony to the contrary. In the other cases, as hereinbefore stated, the men on trial took the stand and testified they had banded together to go to Mexico and engage in armed rebellion. The defendant did not do so in this case, consequently the State had to make other proof showing the object and purpose of the band of men, and whither they were bound. Cline, clearly by all the testimony shown to be a member of the company, separated from the others a short time before their arrest, and he was the first one arrested. When arrested there was found on his person a manifesto, which translated into English, reads as follows:

### "MEXICANS:

"The board of organization of the Mexican Liberal Party views with complacency your efforts to place in practice the high ideals of political, economical and social emancipation, whose supremacy throughout the world will put an end to that already sufficiently prolonged struggle between man and man, which has its origin in the inequality of riches, which emanates from the principle of private ownership of property.

"The abolishment of that principle signifies the annihilation of all institutions, political, economic, social, religious and moral which generates the gaseous atmosphere within which are asphyxiated free initiative and the free association of mankind, who see themselves forced, in order to survive, to engage in deadly competition, from which those who emerge triumphant, are not the good, neither the most unselfish nor the best endowed, physically, morally and intellectually, but the most astute, the most egotistic, the least scrupulous, the most hardhearted, those who place their personal welfare above every consideration whatsoever of human solidarity and of human justice.

"Without the principle of private ownership of property there is no reason for the existence of a government, necessary only to keep within bounds the disinherited in their complaints or in their rebellion against the deforciants of social riches—nor the church reason to exist whose exclusive object is to extrangulate in man the innate rebelliousness against oppression and exploitation, through preaching about patience, resignation and humility, stifling the cries of the most powerful instincts, and fruitful with the practice of immoral penances, cruel and hurtful to the health of persons, and so that the poor may not aspire to the joys of earth and constitute a danger to the privileged of the earth, promise to the humblest, to the most resigned, to the most patient, a heaven which swings in the infinite space beyond the visible stars.

"Capital, Authority, Clergy, here you have the somber trinity which makes, of this beautiful world, a paradise for those who have succeeded in grasping in their claws by their astuteness, violence and crime, the product of hard labor by the sweat of the brow, by blood, by tears and sacrifices of thousands of generations of workmen and a hell for those who, with their hands and their intelligence cultivate the soil, move machinery, construct houses, transport products, thus leaving humanity divided into two social classes, with interests diametrically opposed; the capitalist and the laborer. The class which possesses the land, the machinery of production and the means of transportation for the rich products, and the class which reckons only with his hands and his intelligence for his support.

"Between these two social classes there can not exist any bond of friendship or fraternity, for the property-holding class are always disposed to perpetuate the economic, political and social system, which guarantees to them peaceful enjoyment of their plunder, while the working class makes efforts to destroy that iniquitous system, in order to install a medium on the earth, by which the land, the houses, the machinery of production and the means of transportation may become of common use.

"Mexicans: The Mexican Liberal Party recognizes that every human being, from the sole fact of having been born, have the right to enjoy of all and of each and every advantage which modern civilization offers, for those advantages are the product of the efforts and sacrifices of the working class of all ages.

"The Mexican Liberal Party recognizes that work is necessary for

the maintenance of the individual and of society, and consequently everybody, with the exception of the aged, the maimed, the weak-minded and the children, must dedicate themselves to produce something useful, so that they will be enabled to give satisfaction to their needs.

"The Mexican Liberal Party recognizes that the so-called right of individual property is an iniquitous right, because it subjects the greatest number of human beings to work and to suffer for the satisfaction and ease of a small number of capitalists.

"The Mexican Liberal Party recognizes that the Government and the Clergy are the support of the iniquitous capital. Therefore, the Board of Organization of the Mexican Liberal Party has solemnly declared war against authority, war against capital, war against the Clergy.

"Against Capital, Authority and Clergy, the Mexican Liberal Party has unfurled the red banner in the fields of action in Mexico, where our brothers are battling like lions, contending for victory against the hosts of the Patricians, or be it, Maderistas, Reyistas, Vasquistas, Cientificas and many others, whose only purpose is to elevate a man to the first magistracy of the country, to do business under his shadow, without any consideration for the entire mass of the population of Mexico, and all of them recognizing as sacred the right of individual property.

"In these moments of confusion so propitious for the assault against oppression and exploitation, in these moments in which the Government crushed, unbalanced, vacillating, attacked on all sides by the forces of all the unbridled passions, by the tempest of all the appetites whetted by the hopes of a proximate satiety; in these moments of anxiety, of anguish, of terror for all the privileged, compact masses of disinherited beings, invade the lands, burn the titles to property, place the creating hands on the fertile soil and threatening with their closed fist all that which yesterday was authority, Capital and Church, they open the furrow, scatter the seed and await with emotion the first fruits of free labor.

"These are, Mexicans, the first practical results of the propaganda and the action of the soldiers of the people, of the generous supporters of our principles of equality, of our brothers who defy all imposition and exploitation with this cry, of death to all those above and of life and hope for those below; Long Live Land and Liberty!

"The tempest increases in fury from day to day. Maderistas, Vasquistas, Reyistas, Cientificas, Delabarristas cry out to you, Mexicans, to return to defend their tarnished banners, protectors of the privileges of the Capitalist Class. Do not listen to the sweet songs of those sirens who desire to take advantage of your sacrifices to establish a Government; that is, a new dog to protect the interests of the rich. Arise, everybody, but only to carry out to a finish the expropriation of the property which the rich retain.

"The expropriation must be carried out to a finish by blood and fire during this grandiose revolution, as our brethren have done and are

doing; our brethren, the inhabitants of: Morelos, South of Puebla, Michoacan, Guerrero, Vera Cruz, North of Tamaulipas, Durango, Sonora, Sinaloa, Yucatan, Quintana Roo and in parts of other States as even the very patrician Public Press of Mexico, has had to acknowledge, that the people have taken possession of the land without waiting for a paternal government until it design to make them happy, conscious that there is nothing good to be expected from governments and that the emancipation of the laborers must be the work of the workingmen themselves.

"These first acts of expropriation have been crowned with the most flattering of successes, but the limit must not be placed at taking possession of the land and implements of agriculture only.

"There must be taken possession, resolutely, of all the industries by the workingmen employed therein, obtaining in this manner that the land, the mines, the manufacturers, the workshops, the smelters, the cars, the railroads, the ships and all the warehouses of every kind and the buildings, remain in the possession of all and every one of the inhabitants of Mexico without distinction of sex.

"The inhabitants of each locality in which such an act of supreme justice has been carried out have nothing else to do but to come to an agreement between themselves, that all the effects that are found in the stores, warehouses, granaries, etc., be carried to a place of easy access for everybody where men and women of good (will) repute, shall make out a minute inventory of everything that has been gathered together, in order to calculate the duration of the stock on hand, having in view the needs and the number of the inhabitants who have to make use of it, from the time of expropriation until in the fields are raised the first crops, and in the other industries are produced in the first products.

"The inventory made, the workingmen of the different industries will understand each other fraternally in order to regulate production so that, during this movement no one shall lack for anything and only those will die of hunger who do not desire to work, with the exception of the aged, the maimed and the children, who shall have the right to the enjoyment of everything. Everything produced shall be sent to the general storehouse of the community, from which all shall have the right to take, all that they may need according to their wants, without other requisite than to exhibit a badge that he is working in this or that industry.

"As the aspiration of man is to have the greatest number of gratifications, with the least effort possible, the most adequate means to obtain that result, is work the land and the other industries in common. If the land is divided and each family takes a portion, besides the grave danger which is run of once again dropping into the capitalist system, for there will not be a lack of astute men, or who have habits of saving, who will succeed in having more than others and be enabled in time to exploit their fellow men; besides this grave danger, the fact stands out, if a family cultivates a piece of land, it will have to work

as much or more than is done at present under the system of individual property to obtain the same meager result which is obtained at present, while, if the land is united and worked in common, the farmers will work less and produce more. Of course there must not be a lack of land, so that every person can have his house and a good lot to dedicate it to the uses most agreeable to him. The same as is said of the work in common of the land, can be said of the work in common of the manufacturers, workshops, etc., but each one according to his temperament, according to his tastes, according to his inclinations, may choose the kind of work that best suits him, so that he produces enough to cover his needs and not be a charge upon the community. Working in the manner set forth, that is, following immediately after the expropriation, the organization of production, free of owners and based on the needs of the inhabitants of each locality, no one will be in want of anything, notwithstanding the armed revolution, until this movement being ended with the disappearance of the last aristocrat and of the last authority, or its agent, the law, the support of the privileged class, broken in pieces and everything placed in the hands of those who work, we will embrace each other with a fraternal embrace, and will celebrate with peans of joy, the installation of a system which will guarantee to every human being food and liberty.

"Mexicans: For all this, the Mexican Liberal Party struggles. For this a band of heroes shed their generous blood, who battle 'neath the Red Flag, with the portentous cry of, Land and Liberty!

"The Liberals have never unbuckled their weapons, notwithstanding the treaties of the traitor Madero with the tyrant Diaz, and notwithstanding also of the attempts of the aristocrats to fill their pockets with gold, and this has been so, because we, the Liberals, are men, convinced that political liberty is not of advantage to the poor, but to the hunters of offices, and our object is not to obtain offices nor distinctions, but to take away all from the hands of the aristocrats, so that everything shall remain in the hands of the workingmen. The activities of the different political bands which at the present time dispute among themselves the supremacy in order that the one which triumphs to do exactly the same as the tyrant Porfirio Diaz did, because no man, however well disposed he may be, can do anything in favor of the poor class when he finds himself in power; that activity has produced chaos, which we, the disinherited, must take advantage of; the especial circumstances in which the country is found in order to put in practice without loss of time, on the spot the sublime ideals of the Mexican Liberal Party, without waiting for peace to be declared to carry out the expropriation, for by that time the stock of goods in the stores, granaries, warehouses and in other depositories would have been exhausted and at the same time, by reason of the state of war in which the country has been, production had been suspended, hunger would be the result of the struggle, while, carrying out the expropriation and the organization of the free work during the revolution, neither would there be a lack of the necessities of life in the midst of the movement nor afterwards.

"Mexicans: If you want to be free at once, do not fight for any other cause that is not of the Mexican Liberal Party. All offer you political liberty after triumph. We, the Liberals, invite you to take the land, the machinery, the means of transportation and the houses right now, without waiting that anyone to give them to you, without waiting for the law to decree such a thing, because the laws are not made for the poor but for gentlemen with dress suits, who take good care not to make laws against their own caste. It is our duty, for us, the poor, to work and struggle to break the chains which make slaves of us. To leave the solution of our problems to the educated and rich classes, is to place ourselves voluntarily in their claws.

"We the plebians, we the ragamuffins, we the hungry, we, who have not even a stone upon which to recline our head, we, who live tortured by the uncertainty of obtaining a piece of bread for the morrow for our wives and our children; we, who having reached old age, are ignominiously discharged, because we can no longer work, behooves us to make strenuous efforts, innumerable sacrifices, to destroy to the very foundation the structure of the old society, which has been up to the present, an affectionate mother for the rich and the rascals and a cold-hearted stepmother for those who work and are good. All the evils which affect the human race arise from the present system, which forces the majority of humanity to work and to sacrifice itself for a privileged minority, to satisfy all their needs and even all their caprices, living in idleness and in vice. And the evil would be less if all the poor had their work assured; as the production is not arranged to satisfy the needs of the laborers, but to leave profit to the patricians, these contrive to produce no more than they calculate can be expended by themselves, and from this result the periodical shutting down of industries or the reduction of the number of employes; this, also, arises from the fact of the perfection of machinery, which substitutes with advantage the hands of the employes.

"To put an end to all this, it is necessary that the laborers take in their hands the land and the machinery of production and be the ones to regulate the production of riches, tempered to their own needs.

"Robbery, prostitution, assassination, incendiarism, swindling, are the results of the system which places men and women under conditions, so as not to perish or hunger, forced to take what they need where found, or to become criminal; for in the majority of cases, although there may exist the greatest desire for work, no work is to be found, or is so poorly paid that the salary does not cover the most pressing needs of the individual or family; besides, the long hours of work under the present system of the capitalists and the condition under which they are affected, in a short time, undermines the health of the laborer and even ends his life in the catastrophe which takes place in workshops, which has no other origin in the disdain with which the governing class looks upon those who sacrifice themselves for them.

"The poor, irritated by the injustice of which he is the object, angry at the ostentatious display of luxury paraded before his eyes by those

who do nothing, beaten by the 'cop' (policeman) on the streets for the crime of being poor; forced to employ his hands in work not to his liking; poorly paid, despised by all those who know more than he does, or who, by reason of having money, believe themselves to be superior to those who have nothing, faced by an expectant sad old age, the death of an animal, driven out of the stable as useless; worried by the possibility of being without work from one day to another; forced to look upon even those of his own class as enemies because he does not know which one of them may go to hire himself for less than he is earning, it is natural that under these circumstances there develops in the human being anti-social instincts, and be it crime, prostitution, disloyalty, the natural fruits of the old and odious system which we want to destroy, even to its deepest roots, in order to create a new one, of love, of equality, of justice, of fraternity, of liberty.

"Arise all as one man, in the hands of all is tranquility, well-being, liberty, satisfaction of all same appetites, but let us not allow ourselves to be led by directors; that each one be his own master; that everything be arranged by the mutual consent of unhampered individuality. Death to Slavery; death to Hunger; Long live Land and Liberty!

"Mexicans: With the hand placed over the heart and with a peaceful conscience, we make you a formal and solemn call, that every one of you all, men and women, adopt the high ideals of the Mexican Liberal Party. As long as there are rich and poor, governments and governed, there will not be peace, nor is it to be desired that there should be, because that peace would be based on inequality, political, economic, and social of millions of human beings, who suffer hunger outrages, prison and death, while a meager minority enjoy all sorts of pleasures and liberties for doing nothing.

"To the struggle; to expropriate with the idea of benefit for all and not for a few, that this war is not a war of bandits, but of men and women who desire that all be brethren and enjoy as such the goods which nature cheerfully offers to us, and the hands and intelligence of man have created, with the single condition that each one shall dedicate himself to a work really useful. Liberty and well-being are within reach of our hands. The same efforts, the same sacrifice that it costs to elevate a Governor, that is, a tyrant, costs the expropriation of the goods which the rich retain. To choose, therefore, a new Governor, a new yoke, or the redeeming expropriation and the abolishment of all impositions, political, religious or from any other order whatsoever.

### LAND AND LIBERTY.

"Given in the City of Los Angeles, State of California, United States of America, this the 23rd day of the month of September, 1911.

> Ricardo Flores Magon,
> Librado Rivera,
> Anselmo L. Figueroa,
> Antonio de P. Araujo,
> Enrrique Flores Magon.

## TO THE WORKMEN IN GENERAL.

"Every person who is in accord with the principles for which the Mexican Liberal Party struggles, is cordially invited to help in the manner most agreeable to himself, in order to obtain the triumph of our principles. All remittances of money and all correspondence must be directed without fail to Manuel G. Garza, 914 Boston Street, Los Angeles, California, U. S. A.

"The success of the revolution which is being developed on Mexican soil depends in a great measure on the generous help with money loaned to the Mexican Liberal Party. No working man should hesitate to send his contribution for the encouragement of this grand struggle against graft and tyranny. If the poor do not furnish their share for the triumph of the interests of their class, they can not expect that the rich will do anything for them. If the poor, dazzled by the gold of the patricians, enroll themselves under some banner of the patrician, they will be food for the cannon during the war, and food for exploitation, for jail and barracks in time of peace. The poor should unite resolutely with the Mexican Liberal Party, and make the declaration sent out on the 23rd of September their own. There is no other party which fights with the sincerity of the Mexican Liberal Party. Hurl far from you, disinterested ones, all those who speak to you to remedy your condition through the law; they are your worst enemies, for knowing that the law in all times, and in every place is always on the side of the rich, they hold it out to you as the shield of the weak, while in reality it is the yoke of which the high class make use of to keep down in submission the poor. Fix your minds attentively on this. All those who want you to elevate them, tell you to help them, and that they in turn will make your happiness after the victory.

"Porfirio Diaz spoke in that manner to the public when he was a revolutionist. Francisco L. Madero spoke to you in like manner. All the governors which we have had since our independence from Spain up to the present time, promised the same thing, and not one of them could carry it out.

"No government will be able to carry out the promises of welfare and of liberty made to the poor, because from the simple fact of being a government it is obliged to safeguard the goods of the rich. Therefore, we must not confine our own welfare to a government. Welfare will be acquired disavowing the right of individual property, and taking possession of the land for all, men and women, and the means of production and consumption. This ought to be done before there is peace; before some government becomes strong, because then it will be necessary to commence a new revolution to obtain it.

"It is in these moments when the government is weak that the poor ought to take possession of the lands and everything which exists for the benefit of all. If it is not done today, afterwards it will be too late."

This authorized a jury to find that it was an armed force going into Mexico to engage in rebellion against the then established government;

in fact, all government. In the camp, and on one of the other men was found a flag as described in this manifesto, bearing the words, "Pardido Liberal"—land and liberty; also guns, bayonets, swords, dynamite caps, fuses, dynamite, etc. This testimony with all the other facts and circumstances in evidence will support a finding that these men and all and each of them had organized under this manifesto, and were on their way to Mexico to engage in this armed rebellion, and this was their object and purpose. But appellant contends that much of this evidence was inadmissible and especially the manifesto found upon Cline at the time of his arrest. If Cline was on trial would anyone question that this instrument found in his possession would be admissible in evidence against him as tending to show his object and purpose, and if not by what rule of law would it be inadmissible against a co-conspirator? The rules of law governing in conspiracy cases have been well established, and as said by a well known writer:

"The conspiracy may, of course, be shown by direct evidence, and it is apprehended should be so proved if this character of evidence is attainable. Direct evidence is, however, not indispensable. Circumstantial evidence is competent to prove conspiracy from the very nature of the case and the rule which admits this class of evidence applies equally in civil and criminal cases.

"In the reception of circumstantial evidence great latitude must be allowed. The jury should have before them every fact which will enable them to arrive at a satisfactory conclusion. And it is no objection that the evidence covers a great many transactions and extends over a long period of time, provided, however, that the facts shown have some bearing upon, and tendency to prove, the ultimate facts at issue. But much discretion is left to the trial court, in a case depending on circumstantial evidence, and its ruling will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact.

"If it be shown that several have combined together for the same illegal purpose, any act done by one of them in pursuance of the original concerted plan, and with reference to the common object, is in the contemplation of the law, the act of all, and therefore proof of such act will be evidence against any of the others who were engaged in the conspiracy, and any declaration made by one of the parties in the absence of the others during the pendency of the illegal enterprise is not only evidence against himself, but against all the other conspirators, who, when the combination is proved, are as much responsible for such declarations and the acts to which they relate as if made and committed by themselves."

These rules have been approved in all the text-books and in the following cases in our own court: Atkinson v. State, 34 Texas Crim. Rep., 424; McKenzie v. State, 32 Texas Crim. Rep., 568; McFadden v. State, 28 Texas Crim. App., 241; Clark v. State, 28 Texas Crim. Rep., 189; Phillips v. State, 26 Texas Crim. App., 228; Williams v. State, 24 Texas Crim. App., 17; Kennedy v. State, 19 Texas Crim. App., 618;

Pierson v. State, 18 Texas Crim. App., 524; Post v. State, 10 Texas Crim. App., 579; Avery v. State, 10 Texas Crim. App., 199; Cox v. State, 8 Texas Crim. App., 254, and the authorities cited in the Serrato and Gonzales cases. Again it has been said:

"Where the guilt of a party depends upon the intent, purpose or design with which an act is done, or upon his guilty knowledge thereof, collateral facts in which he bore a principal part may be examined into for the purpose of establishing such guilty intent, design, purpose or knowledge. It is sufficient that such collateral facts have some connection with each other as a part of the same plan or as induced by the same motives, and it is immaterial that they show the commission of other crimes. The evidence in a conspiracy is wider than perhaps in any other case. Taken by themselves, the acts of a conspiracy are rarely of an unequivocally guilty character, and they can only be properly estimated when connected with all the surrounding circumstances.

"Although the fraudulent and corrupt combination, the common design, is the essential element, it is not necessary to prove that defendants came together and actually agreed in terms to have this common design and to pursue it by common means and so carry it into execution. Such proof can seldom be made and therefore is not required. It is sufficient to justify the jury in finding a conspiracy if it is shown that the persons charged with conspiring pursued by their acts the same object, often by the same means, one performing one part of an act and the other another part of the same act, so as to complete it, with a view to the attainment of the object which they were pursuing." Cyc., vol. 8, p. 684; Mason v. State, 31 Texas Crim. Rep., 306; Smith v. State, 21 Texas Crim. App., 107.

It was incumbent upon the State to establish a conspiracy to do some unlawful act by these gathered at Capones ranch to hold each and every one of them liable for the act of those four who actually fired the fatal shot into the body of Ortiz, unless the testimony would show a specific conspiracy participated in by appellant to kill Ortiz. And if it did not show a specific conspiracy to kill Ortiz, then to show the killing of Ortiz was incident to and grew out of the conspiracy to do the unlawful act, and which would in law be considered as embraced in the contemplation of all of them. In this case such evidence was dependent upon circumstantial evidence, and as is said by this court in Smith v. State, 21 Texas Crim. App., 107: "The ancient doctrine that a conspiracy must first be established *ipso facto* before proof of acts and declarations of the individual conspirators are admissible against each other, is now exploded. The rule as it now exists is stated in the case of Cox et al. v. State, 8 Texas Court of Appeals, 254, as follows: 'Ordinarily, when the acts and declarations of one co-conspirator are offered in evidence against another co-conspirator the conspiracy should itself be first established *prima facie,* and to the satisfaction of the judge of the court trying the cause; but this can not always be required. It can not well be required when the proof depends upon a vast amount of circumstantial evidence—a vast number of isolated and independent

facts. And in any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that a conspiracy actually existed, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations.' "

And under this rule of law it is apparent that the court did not err in admitting those things found on Cline at the camp ground—the manifesto, the battle flag, the bugle, the guns, bayonets, dynamite, other munitions of war, etc., in evidence, and testimony in regard to where found and what was found. This was most cogent testimony to show the conspiracy and object and purpose of the conspiracy as originally formed and why the men had gathered together at this ranch, consequently bills of exception Nos. 5 and 6 present no error. And as the conspiracy entered into did not terminate until the arrest of the defendants, there was no error in admitting in evidence all that took place, and what each of the conspirators said from the time of their discovery on the ranch (and the kidnaping of Buck and Ortiz) until the arrest of the defendants, so bills of exceptions Nos. 3, 4 and 8 present no error. All this testimony was ruled properly admissible in the Serrato, Gonzales and Vasquez cases, and this record only demonstrates that the court did not err in so holding. The manifesto more clearly shows the object and purposes and the means to be used to accomplish those purposes than did the testimony in the other cases; the flag, bugle, weapons and ammunition and other indicia authorize a finding that they were organized under this manifesto and their acts and conduct justify a finding that they at the time of their capture were on their way to Mexico to engage in this armed resistance. Another thing in this record manifests why Ortiz was killed when he refused to go further. Buck at one time stopped and refused to go on when he says the following took place:

" 'They taken me on and cussed and abused me all the time trying to make me hurry; made me walk over places I couldn't walk and run their guns against me all day, until I was rescued. I packed the load and was going very well up to about 12 o'clock. They gave me water up to about 12 o'clock and I didn't get any water any more and it was one of the hottest days we had last September. I got overheat. I got sick and I admit I gave out one time. I didn't see that I could go any further. I told the captain and Cline that I couldn't. I was sick and that I couldn't go but that I had gone as far as I could, if they were going to kill me they would have to kill me that I couldn't go. They stopped and looked at me just a few minutes, stood around and the captain told them to go on, told the bunch to go on. They walked about thirty steps I suppose. I could see them from where I was lying. They stopped. He kept two men with him, when they walked off; he told them to take the packs off of the "son-of-a-bitch." They taken the packs off of me. I was lying down on the ground. I just made up my mind I wouldn't walk another step. I knew what was coming off, so when they got those packs off of me I told them, I says, "I will

make one more walk." So I got up and made another walk. I walked about half a mile or three-quarters of a mile, and gave out again, had to stop again and when I did they began to pull out some tobacco and all went to smoking; sat down and smoked. We had been there, I suppose, I don't know—' Q. 'Wait a moment, I will take that up again. In connection with your stop at that time state all that was said, if there was anything said, in regard to their purport.' A. 'Oh! when he taken these packs off. They told me when they were taking those packs off, he said, "Do you think we are going to leave you, you son-of-a-bitch, to tell any yarns?" I told him, I said, "I don't know what you are going to do."' Q. 'What did he say then?' A. 'He said, "If you don't go we will kill you, you son-of-a-bitch."''

Mr. Buck testifies that appellant was present when this scene took place, and was also present when a like scene occurred and Ortiz refused to walk, and was shot to his death. They were not going "to leave them behind to tell any yarns" or in any manner interfere with the accomplishment of their purpose.

After Cline's arrest he told the soldiers and posse where the others could be found, and they were found at the place Cline stated. This was not a confession of any character such as its admission is prohibited by the statute, and there was no error in admitting this statement of Cline even though he was under arrest at the time he made it. They followed the information received and found appellant and the others at that point.

A hat, rope and belt were introduced in evidence. The hat was shown to be the hat worn by Ortiz; the rope, the rope with which his hands were tied behind him, and the belt, the belt with which the load was fastened on him by the men at the time a pack horse was made of Ortiz, all of which were left on him when he was killed. Unless this was intended to aid in demonstrating the manner and mode of his death, and the position he must have been in at that time, we do not understand the object and purpose of introducing these articles in evidence. However, the hat, nor the rope, nor the belt are shown to have any blood thereon, nor to have been other than an ordinary piece of rope and a belt, and if a witness should testify a man was tired, and tied with this rope and loaded down, and they buckled the load on him with this belt, we can see no objection to such testimony, unless there was something about the rope or belt which would be calculated to inflame the minds of the jury and cause them to assess more punishment than they otherwise would. Certainly such articles could have no bearing on whether or not a conspiracy had been formed, what the object and purpose of the conspiracy was, nor whether the killing of Ortiz or any other man, if he got in their way, was within the contemplation of the parties at the time the conspiracy was formed, nor prove injurious to appellant's defense as made.

The only other bills of exception in the record relate to bringing into the courtroom the persons other than appellant jointly charged with killing Ortiz. In the bill it is not claimed that appellant was hand-

cuffed, but it is alleged that his co-defendants were handcuffed at the time they were brought into the courtroom, and their handcuffs removed in the courtroom in the presence of the jury. The objections stated are: "I will state to the court that the defendant desires to take a bill of exceptions to the bringing of the other defendants in the courtroom during the trial of this case. The further fact that they were brought into this courtroom in the presence of the jury handcuffed, that the handcuffs were taken off of the prisoners in the presence of this defendant and the jury; we want the bill to further show that this defendant filed and was granted a motion of severance and was entitled to be tried in that manner without bringing in the other parties, as the same is calculated to prejudice the rights of this defendant to a fair and impartial trial, as guaranteed under the statutes of this State. We want the bill to further show the matter was called to the court's attention prior to the other defendants being brought into the courtroom and that the attorneys for defendant objected to their being brought into the courtroom. The fact of their being brought into the courtroom can be for no other reason than to prejudice the jury against the defendant's rights and create in their minds the idea that he belongs to a gang of criminals." We can not see how the bringing of the co-defendants into the courtroom could in the least tend to show whether or not appellant was a member of the company or joined them in a conspiracy, and whether or not he by his acts and conduct had rendered himself liable as a principal for the death of Ortiz. The mere presence of these other men would be no evidence of that fact, and if the testimony should show that each of the others, or some of them, were guilty of killing Ortiz, unless the evidence should also show that appellant was guilty, their presence would not show nor tend to show that fact. If the men were out on bond and they desired to attend the trial of their co-defendants, the court could hardly exclude them, nor would it be proper to do so, if they behaved themselves. And how does the fact that they were under arrest change the attitude of matters? It is the first time (where he is not to be used as a witness) we have heard it contended that the mere presence of a co-defendant would work injury to the one on trial. The court gives as his reason for permitting them in the court-room, that they were needed for the purpose of identification. If the court had in mind the severe cross-examination of State's witnesses in the Jesus Gonzales and other cases, we can readily understand why he thought it proper to have the others charged with the offense in the courtroom for identification, for in the Gonzales case they had to be brought in. Buck and Gardner had never known the defendants until the day Ortiz was killed; they still claim not to know the names of each separately, but know the men and can point them out on sight, and Buck details the participation of each. But appellant insists that if they were permitted in the courtroom, they should not have been brought in handcuffed together, and cites us to a number of cases wherein the trial courts are criticised for permitting the person on trial to be brought into the courtroom with handcuffs on him. But it will

be noticed in the bills in this case it is not contended that the appellant was brought into the courtroom with handcuffs on him, but only that his co-defendants were brought in handcuffed, and released as soon as they got in the courtroom. In all the cases cited by appellant it was a case where the person on trial himself was the one so brought into the courtroom, and not a co-defendant who was not on trial. But while the practice is condemned, yet in each of the cases the rule seems to be, as said in Powell v. State, 50 Texas Crim. Rep., 592, 99 S. W. Rep., 1005, that it is not permissible to bring the defendant into the courtroom manacled except in extreme cases. As the bill does not show that appellant was manacled, the bill presents no error, but if he should have been, we could not, from the record before us, say the court had abused the discretion confided to him by law. The evidence in this case shows that a company of men had banded themselves together to go into a foreign state to engage in rebellion, to use no stronger term; that they kidnaped two officers of the law, murdered one of them while his hands were tied behind him and he was helpless; cursed and mistreated the other, and engaged in a pitched battle to prevent arrest, and only surrendered when several of them had been killed. These were the character of men the record discloses the court was dealing with, and if in going to and from the jail with such prisoners the court deemed it advisable to permit them to be handcuffed, we can not say that it was an abuse of his discretion. This court never saw the men, or either of them, and knows nothing of their characteristics; we have but the record of a body of armed men, going about the country, in defiance of the law and the officers, and when approached by two officers, with drawn weapons they compel their surrender, and murder one of them while he is helpless, without any just cause or provocation so far as this record or the records in the companion cases disclose.

At the time the charge was submitted to counsel for their inspection but two objections were made thereto. The second one, that after the words "conspired and confederated" in the ninth paragraph the court failed to follow with the words "to commit the offense" was sustained by the court and the words inserted before the charge was read to the jury. The only other complaint is that the court erred in not instructing the jury the specific language of article 78 of the Code: "Any person who advises or agrees to the commission of an offense, who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act." The court's charge in paragraph 8 fully defines the law of principals as applicable to this offense, and this criticism presents no error.

Special charge No. 1, requested by appellant, was embodied in the court's charge as given to the jury, as was also appellant's only other special charge. The complaints of the charge in the motion for new trial for the first time, and contained in the brief, can not be considered by us, as the law now is, all objections to a charge shall be made at the time same is submitted to counsel for their inspection.

Appellant's propositions of law, that if a conspiracy is not shown, statements, acts and conduct of third persons are not admissible, and further that if a conspiracy is shown, then proof of acts or declarations of co-conspirators made in the absence of a defendant after the completion of a conspiracy are not admissible in evidence, are sound, and we heartily approve the law as laid down by the authorities cited by him on those two propositions. But having held that the evidence authorized a finding by the jury that a conspiracy was formed, and that it continued until the time of their arrest, the authorities have no application to this case. Neither can we sustain the contention that the evidence does not sustain a verdict under the law as given in charge by the court. The contention that the court erred in authorizing a conviction if there was a specific conspiracy to take the life of Ortiz, if it had been desired to be complained of, the charge should have been objected to on that ground at the time the charge was submitted to counsel for inspection. But the contention, there is no evidence to form the basis for such a charge in this record is not well founded. Appellant and the men jointly charged with him were gathered together in a pasture on a creek, where they had assembled arms and ammunition; officers went there to make an investigation; two of these officers were taken charge of by appellant and those with him, Buck saying, a "bunch of men had their guns pointed at us—this man (appellant) being one of them. Some disarmed us and took us into camp, the others keeping their guns on us. Four or five said Ortiz was the man who put the officers onto them and had been helping the officers for several years and putting them onto the Mexican people, when Rangel walked around, called Ortiz a son-of-a-bitch and said, 'You will never help them again. You killed one of our comrades at Ashland, and you will never get to kill another one, nor never again get to help any officers.'" It was not a great length of time until Ortiz was killed. It may be that the court thought this raised the issue of a specific agreement in which all present were participants to kill Ortiz for having killed one of their comrades at Ashland, and for having put the officers onto them, and if so, and this had been the finding of the jury, we would not disturb the verdict, but the impression made on our minds by the record is, that the killing grew out of the general conspiracy, amply proven by all the testimony, and that it was incident to and so connected with said general conspiracy in a way that if appellant was proven a party to the general conspiracy it would be under such circumstances as to render him liable for the death of Ortiz equally with those who in fact fired the shots.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE, dissenting.